UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK D. ETIENNE,<br><br>                                    Plaintiff,<br><br>          - against –<br><br>VERIZON WIRELESS, INC.,<br><br>                                    Defendant. | 05 CIV. 2631 (CM/MDF)<br>ECF Case<br><br>Defendant's Rule 56.1 Statement |

Pursuant to Local Civil Rule 56.1 Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless" or the "Company") sets forth below material facts as to which there is no genuine issue to be tried.

## Background

1.      Verizon Wireless hired Etienne in 2001 as a Customer Service Representative in its Orangeburg, New York call center. (Etienne Tr. at 17.)[1]

2.      On November 1, 2003, Etienne transferred, at his request, to the retail store located in the Galleria Mall in Middletown, New York, where he worked as a Retail Service Representative. (Etienne Tr. at 18.)

3.      Throughout Etienne's employment, Verizon Wireless maintained a policy prohibiting sexual harassment and discrimination on the basis of race, age,

---

[1] Excerpts from the deposition transcripts of Plaintiff Mark D. Etienne, cited herein, are annexed to the Affirmation of Lisa E. Dayan, Esq., at Exhibit A and are referred to herein as "Etienne Tr. at ___". Excerpts from the deposition of Thomas Bowe ( "Bowe Tr.") are attached to the Dayan Aff. at Exhibit B. Excerpts from the deposition of Kathy Lippa ("Lippa Tr.") are attached to the Dayan Aff. at Exhibit C, and excerpts from the deposition of Luis Rivera ("Rivera Tr.") are attached to the Dayan Aff. at Exhibit D. Exhibits to these depositions, referred to herein as "Etienne Ex. ___," "Bowe Ex. ___," etc., are also attached to the Dayan Affirmation.

national origin and gender, a policy about which Etienne was aware. (Etienne Tr. at 73 and Etienne Ex. 2, attached to the Dayan Aff. at Exhibit E.)

### Investigation Of Allegations Of Sexual Harassment By Etienne Of Two Female Employees of Galleria Mall Store

4.      On January 24, 2005, the manager of the Galleria Mall store, Tom Bowe, learned, for the first time, of an allegation made by Jinda Furlipa that Etienne had grabbed her buttocks. (Bowe Tr. at 15, 67-70; Bowe Ex. 11, attached to the Dayan Aff. at Exhibit F.)

5.      Bowe spoke to Furlipa who related the details of the incident to him. (Bowe Tr. at 75-77; Bowe Ex. 11.)

6.      Furlipa also informed Bowe that another Middletown store employee, Shavone Harris, had been subjected to harassing behavior by Etienne as well. (Bowe Tr. at 41, 78; Bowe Ex. 11.)

7.      A new, and relatively inexperienced, assistant store manager, Rick Thorner, had heard Furlipa's complaint that Etienne had touched her buttocks some time earlier, before Bowe learned of the complaint on January 24, but Thorner did not alert Bowe, and Thorner did not contact Human Resources. (Bowe Tr. at 67-70; Rivera Tr. at 21; Bowe Ex. 11, 13.)

8.      Further, Thorner was not aware of the extensive allegations later made by Harris, which came to Bowe's attention for the first time on January 24. (Bowe Ex. 11 and Bowe Ex. 13, attached to the Dayan Aff. at Exhibits F and H.)

9.      Bowe also spoke to Lenny Arias, a store employee, who told Bowe that he had spoken to Etienne about Etienne touching Furlipa's buttocks and

asked him to apologize to Furlipa, but Etienne had refused. (Bowe Tr. at 70; Bowe Ex. 11.)

10. After speaking to Furlipa and Arias and learning of supposed comments made to Harris, Bowe immediately alerted the Company's Human Resources department and sent a detailed e-mail to Kathy Lippa, the Human Resources consultant responsible for the Middletown store. (Bowe Ex. 11.)

11. Lippa immediately commenced an investigation into the matter. (Lippa Tr. at 18-19, 21.)

12. Neither Bowe nor Lippa -- *i.e.*, the two people who launched the investigation into the allegations against Etienne -- was aware that Etienne had participated in the Kamal interview. (Rivera Aff. at ¶ 4; Lippa Aff. at ¶ 2.)

13. The investigation into the allegations of sexual harassment was conducted by and at the direction of Lippa and Luis Rivera, Associate Director of Human Resources for the upstate New York region. (Lippa Tr. at 19, 22.)

14. Because Bowe was not going to be in the store the next day, he asked Susan Meaney, the store's Inventory Manager, to speak to Harris and to report back to him and to Human Resources. (Bowe Tr. at 83; Bowe Ex. 12, attached to the Dayan Aff. at Exhibit G.)

15. Meaney spoke to Harris on January 25 and January 26 and sent Bowe and Lippa e-mails regarding what Harris told her. (Bowe Tr. at 83, Bowe Exs. 12, 14, 16, attached to the Dayan Aff. at Exhibits G, I and J.)

16. As related in Meaney's e-mails to Bowe and Lippa, Harris told Meaney that Etienne had made inappropriate harassing comments to her and

that she had not told Bowe about the conduct because she felt uncomfortable doing so. (Bowe Exs. 12, 14 and 16.)

17. Harris told Meaney, and later told Lippa when Lippa interviewed Harris on January 28, that Etienne made comments to her such as:

- "I want to stick my big black cock in your mouth, but your mouth is too small;"

- "What are you a sharecropper or a slave?"

- "Why is your lip gloss always smeared all over your face?" (an apparent reference to oral sex);

- "Wear short skirts so I can stick it up your bootylicious ass;"

- "when am I going to be able to tap that" (meaning have sex with her)

- he heard she was a "freak in the bedroom;"

- he said she must have had a good time at lunch and that he thought she "swallowed", and he then ran his hand across her mouth;

- he invited her to a party and said she had to come because she needed to "get laid";

- he made remarks about her body, such as "nice view;"

- he spread a rumor at the store, which was repeated to her, that she was throwing up because she was pregnant by a customer; and

- he described what he wanted to do with her mouth.

(Bowe Ex. 4 and Plaintiff's Exhibit A, attached to the Dayan Aff. at Exhibit K; Lippa Tr. at 28-41; Bowe Tr. at 87 and Bowe Exs. 12, 14, 16.)

18. Meaney noted in one e-mail that Harris was "in tears" and "pleading for help." (Bowe Ex. 16.)

19. When Lippa interviewed Harris, Harris was "emotionally distraught, to the point where it was very difficult for her to even continue having the conversation." (Lippa Tr. at 40.)

20. Another employee, Dom D'Amico confirmed to Meaney that he had heard Etienne make "flirting" comments to Harris and that he observed that Harris looked uncomfortable; Meaney reported this information to Bowe in an e-mail. (Bowe Ex. 19, attached to the Dayan Aff. at Exhibit L.)

21. In order to expeditiously investigate these allegations of serious inappropriate behavior and prevent any further incidents, Lippa and Rivera, both of whom are located in Rochester, New York, were able to quickly arrange to speak with Etienne, Furlipa, Harris and other employees by telephone. (Rivera Tr. at 52; Lippa Tr. at 19-21.)

22. Lippa and Rivera conducted interviews of Harris, Bowe, Furlipa, D'Amico, Arias, Thorner and Etienne. (Lippa Tr. at 19-21 Rivera Tr. at 52; Plaintiff's Ex. A, Bowe Exs. 4 and 5.)

23. Verizon Wireless gave Etienne a full opportunity to give his side of the story. (Etienne Tr. at 78.)

24. Although Etienne denied making the specific comments alleged, Etienne admitted to being "flirtatious" in the workplace and said that he could not recall what kinds of flirtatious comments he made. (Etienne Tr. at 55-58.)

25. Etienne admitted he had touched Furlipa's buttucks, but claimed it had been an accident. (Etienne Tr. at 23-24.)

26. Etienne admitted that Arias had confronted him about touching Furlipa's buttocks and that he had laughed, that he refused to apologize to

Furlipa when Arias asked him to, and that he said "fuck her," referring to Furlipa. (Etienne Tr. at 27-29, 55.)

27. Rivera and Lippa both noted that Etienne's manner was flat and unemotional and that he did not seem at all outraged or even genuinely surprised by the accusations. (Rivera Aff. at ¶ 5; Lippa Aff. at ¶ 3.)

28. Lippa and Rivera concluded that Harris and Furlipa were credible witnesses, and that Etienne's denials were not credible. (Rivera Aff. at ¶ 6; Lippa Aff. at ¶ 4.)

29. At no point during this or a subsequent conversation with Lippa and Rivera did Etienne claim that he was being subjected to retaliation or even mention his interview in the Kamal matter, nor did he suggest any motivation that either Furlipa or Harris had to lie. (Etienne Tr. at 82-83; Lippa Aff. ¶ 5; Rivera Aff. at ¶ 7.)

30. At his deposition, Etienne could not offer any possible motivation for Harris and Furlipa to fabricate such a story. (Etienne Tr. at 82, 83.)

31. Lippa and Rivera determined that Etienne's conduct warranted his discharge, a decision with which Bowe concurred. (Lippa Tr. at 23-24; Rivera Tr. at 40; Bowe Tr. at 35-36.)

32. On January 31, 2005 Lippa informed Etienne that his employment was terminated. (Etienne Tr. at 21; Lippa Tr. at 23.)

33. Lippa, Rivera and Bowe never made any comments to Etienne about his race or national origin. (Etienne Tr. at 100-01.)

## Interview in the Kamal Matter

34.     On December 27, 2004, at the Company's behest and along with other employees, Etienne was interviewed by the Company's outside counsel and Rivera to discuss allegations raised by a Solectron technician, Vahid "Josh" Kamal. (Rivera Tr. at 10-11; Rivera Aff. at ¶ 2.)

35.     During the course of this interview Etienne disclaimed any knowledge of the vast majority of the allegations made by Kamal and could not identify anyone who had ever made a discriminatory remark to Kamal. (Etienne Tr. at 107-113.)

36.     During this interview Etienne stated the following:

- He never saw any pictures of or cartoons depicting Arabs in the store.

- He never heard the two individuals who Kamal accused of harassment-- Tommy DiSalvo (another technician employed by Solectron) or David Bartolone (the store manager prior to Tom Bowe) -- make any discriminatory comments to Kamal.

- Bartolone and Kamal got along.

- He denied he had heard anyone (i) refer to Kamal as a terrorist, (ii) say all Arabs should be beheaded or (iii) say we should bomb Iraq back to the stone ages.

- While Kamal claims to have complained about discrimination in a store meeting attended by all of the store employees, Etienne denied ever attending such a meeting.

(Etienne Tr. at 107-113.)

37.     When asked at the interview if he had ever heard Kamal call anyone a racist name, Etienne stated that Kamal had called Etienne "brother" and that he heard Kamal refer to someone else as a redneck. (Etienne Tr. at 108.)

38.  During this interview Etienne said he had heard someone use the term "sand nigger," but Etienne acknowledged that he did not hear anyone say this to Kamal, he could not remember by whom or when the comment was made and was unsure if the comment had been made by an employee of Verizon Wireless or Solectron. (Etienne Tr. 112-113.)

39.  At his deposition, Etienne surmised that the term "sand nigger," must have been directed at Kamal, but had no recollection of the context in which the comment was supposedly made. (Etienne Tr. 112-113.)

40.  Based on this interview, Rivera believed that Etienne would be an important witness *for the Company*, in defense of Kamal's claims. (Rivera Aff. at ¶ 3.)

41.  Etienne has no evidence to show that his termination was a pretext for discrimination or retaliation, other than the fact that he was terminated over a month after his interview in the Kamal matter. (Etienne Tr. at 111- 112, 114.)

### Dan Gioia Matter

42.  Brooke Jordan told Thomas Bowe that Jinda Furlipa told her that Dan Gioia, a Caucasian employee, had allegedly made a comment to Furlipa about Jordan. (Etienne Tr. at 90; Bowe Tr. at 54; Bowe Ex. 9.)

43.  Jordan told Bowe that she was not present when Gioia allegedly made this comment to Furlipa. (Bowe Tr. at 59; Bowe Ex. 9.)

44.  No allegation of physical touching was made against Gioia. (Bowe Ex. 9.)

45.  When Bowe questioned Furlipa about Jordan's allegation, Furlipa told Bowe that it never happened. (Bowe Tr. at 58-59; Bowe Ex. 9.)

46. Verizon Wireless concluded that termination of Gioia was not appropriate. (Bowe Tr. at 59.)

47. Etienne has no evidence of either the substance of any complaint lodged against Gioia nor any knowledge of Verizon Wireless's response to any complaint. (Etienne Tr. at 87-92.)

48. Etienne never heard Gioia say anything to Harris, Harris never told him anything that Gioia allegedly said to her, and Etienne does not know whether Harris ever complained about Gioia to anyone in management. (Etienne Tr. at 85-87.)

Dated:  New York, New York
        January 31, 2006

> Respectfully submitted,
>
> KAUFF McCLAIN & McGUIRE LLP
>
> By: _____
>     Harlan J. Silverstein (HJS-4114)
>     Lisa E. Dayan (LD-4491)
>
> 950 Third Avenue, Fourteenth Floor
> New York, New York 10022
> (212) 644-1010
>
> Counsel for Defendant
> Cellco Partnership d/b/a Verizon Wireless

139124.v1                                9